## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| W.H. et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SCHUYKILL VALLEY SCHOOL | : | No. 11-cv-06042 |
| DISTRICT, | : | |
| Defendant. | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                              **June 20, 2013**

This matter was initiated by Plaintiff, C.H., and her parents, W.H. and T.H.,

individually and on C.H.'s behalf, pursuant to 20 U.S.C.A. §1415 (i)(2) and 34 C.F.R.

§300.512(2002), as an appeal from an administrative order, entered on June 30, 2011,

from the Commonwealth of Pennsylvania Office for Dispute Resolution, finding that the

defendant, Schuylkill Valley School District, was not in violation of the Individuals with

Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 et. seq.; Section

504 of the Rehabilitation Act of 1973 ("§504"), 29 U.S.C. §§794, 794(a); and the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12111 et seq., and that the

defendant did not fail to provide C.H. with a free and appropriate public education.

### I.    Background

C.H. is an eleven (11) year-old student in the Schuylkill Valley School District

who is eligible for special education under the IDEA.[1]  C.H's Parents filed a due process

---

[1] C.H. was first evaluated by the District in March 2007 during first grade after Student transitioned from early intervention to school-aged programming.  C.H.'s intellectual disability is at the moderate level with

complaint on March 28, 2011 against the District[2] asserting that it denied C.H. a free, appropriate public education ("FAPE") under the IDEA and §504 from the time period beginning with the start of the 2008-09 school year through the present and including the summer of 2011.[3] Over the course of three hearings, the hearing officer barred C.H.'s parents' claims for the 2008 school year under the statute of limitations. The hearing officer found that, although no educational program is without flaws, the district provided C.H. with a FAPE that was "reasonably calculated to, and did, provide meaningful educational benefit." The hearing officer concluded that the parents' failed to show any deficiency in the educational program and it was not deficient for the District to disagree with and reject independent recommendations while still fulfilling its obligations.

The hearing officer also made the following findings of fact regarding, which the plaintiffs include in their Complaint:

### a. **2008-2009 School Year**

C.H. began attending school in the District in first grade (2006-07).[4] C.H. has had individual speech/language therapy three times during a six-day cycle and has been provided with occupational therapy (OT) and physical therapy (PT) and weekly private speech/language therapy.

---

speech/language impairment. C.H. is verbal but also uses gestures to communicate and C.H.'s speech can be difficult to understand.

[2] The District is a recipient of federal funds as defined by §504.

[3] C.H.'s parents incorporate paragraphs #21 – 24 from the Due Process Complaint stating that the District failed (1) to develop appropriate IEP Goals and Objectives; (2) to appropriately implement the IEP that it did create; and (3) provide C.H. with a FAPE (citing numerous shortcomings). In their motion (Doc. #8-2), plaintiffs state that they incorporated the entire Due Process Complaint in the Civil Action Complaint at issue. (Doc. #8-2 at 15).

[4] Pennsylvania Special Education Officer Hearing Decision, ODR File No. 1639/1011KE (June 30, 2011).

In December 2006, C.H.'s classroom began participating in Pennsylvania's Verbal Behavior Project and C.H.'s parents gave permission for the class to use the Assessment of Basic Language Skills (ABLLS) as its curriculum guide. Prior to September 2008, Student was evaluated for use of a ChatPC[5] and in October, the District implemented a behavior plan. The local intermediate unit ("IU") conducted hearing tests in January 2009 and discovered mild hearing loss in C.H.'s left ear, which would impact C.H.'s access to communication.

For the 2009-10 school year the VB class switched to the Verbal Behavior Milestones Assessment and Placement Program (VBMAPP).[6] The District met with C.H.'s parents in March 2009 and developed behavioral plans to deal with C.H.'s problematic behaviors.[7] At that time, C.H. was using a combination of vocalizations, signs, and gestures to communicate and was beginning to use two and three-word phrases. Progress reports for the 2008-2009 school year indicated improvement with C.H.'s challenging behaviors, such as putting the head down and flopping on the floor.

**b. 2009-2010 School Year**

At the beginning of the 2009-10 school year, the Verbal Behavior Project changed from using the ABLLS to the Verbal Behavior Milestones Assessment and Placement

---

[5] A ChatPC is an augmentative communication device to widen a student's vocabulary. C.H. received this device in February 2009 and uses it individually and with prompting at home, school, and in the community.

[6] The report generated by the VBMAPP is a guide to instruction, not a report of progress and is assessed two times a year.

[7] "Needs identified in this evaluation report were to improve basic academic skills, adaptations to content area (science and social studies) instruction in the general education curriculum, improvement of receptive and expressive language skills, improvement in gross motor skills, and the following accommodations and specially designed instruction: use of a visual schedule with reinforcement after completing 2-3 activities, math instruction using a co-teaching model, and of use of a keyboard overlay and one-click mouse for computer activities."

Program (VB-MAPP).[8] C.H.'s IEP team met several times in the fall of 2009 to develop an IEP, which included goals for academic subjects like math, science, and language and included natural environment teaching and use of computer programs, such as ChatPC.[9] (Doc. #1-1 at ¶ 14). C.H. was also involved in special subject modifications and testing accommodations, and by February 2010 C.H.'s IEP was revised in February and March 2010 to increase the expectations for several of the goals and provide for extended school year programs ("ESY").

The District conducted a re-evaluation of C.H. in May of 2010 to aid in the transition to middle school, and issued a re-evaluation report (RR), based on a number of assessments, such as cognitive and achievement testing.[10] The RR showed that C.H. had made improvements in a number of areas, such as problematic behaviors, and language skills and made recommendations and set goals as to improving basic academic skills and continued OT and PT. Another test that spring revealed more hearing loss, and the audiologist made several recommendations for accommodating C.H., including minimizing background noise and using clearly written and spoken communications. Progress reports for the 2009-10 school year reflected improvements in the vocal imitation, reading, motor skills, and behavioral problems; C.H.'s improvements in math were generally inconsistent.

---

[8] Both the ABLLS and VB-MAPP are based upon the same theory on behavioral analysis of language guides for instruction, and both instruments measure essentially the same skills. Students are assessed using the VBMAPP twice each school year, and the District sends home reports on data from those assessments at least quarterly.

[9] An IU consultant met with C.H.'s teacher and other team members over the course of the 2009-10 school year for additional training on the ChatPC. (Doc. #1-1 at ¶ 12).

[10] The RR continued to conclude that C.H. was eligible for special education on the basis of ID (MR) and speech/language impairment.

C.H.'s parents requested, and the District agreed to fund, an Independent Educational Evaluation (IEE) in the summer of 2010. The District provided C.H. ESY services during the summer and while C.H. made no clear progress, there was no regression shown.

### c. 2010-2011 School Year

In September 2010, C.H.'s IEP was revised to address new goals and program modifications and included PT, OT, speech/language therapy and a one-on-one aide. C.H. repeated the fourth grade, spending 3½ hours per day in the learning support classroom, and spent the rest of the day in homeroom and engaging in What I Need (WIN) time, which includes special activities like music and computer class. A one-on-one aide accompanied C.H. throughout the entire day, except for lunchtime (during the second half of the school year). Throughout the year, C.H. used the Edmark Program for reading, Distar Math, and Touchmath for mathematics, and regular science and social studies classes with some accommodations and modifications.

In October 2010, an independent auditory language processing evaluation was conducted confirming C.H.'s receptive and expressive language delays, articulation difficulties, and hearing loss. The audiologist again made recommendations concerning specific programs, such as auditory training through the FastForWard Language program. Id. At this same time, C.H.'s parents obtained a private occupational therapy evaluation, which revealed "sensory processing disorder impacting [C.H.'s] ability to regulate attention and focus on tasks, follow directions, engage in appropriate play activities and

motor tasks, engage in self-help independently, and derive information from a multisensory environment" and made various recommendations.

Additionally, in October 2010, C.H. was evaluated by an independent school psychologist and an Independent Educational Evaluation (IEE) report was issued, which reflected C.H.'s weaknesses and identified language as C.H.'s primary academic deficit. The IEE evaluator made various recommendations for changing C.H.'s educational plan. C.H.'s IEP team met in January and February 2011, and the parents provided a list of the IEE recommendations that they wished to see implemented. C.H's parents did not approve the February 2011 IEP and advised the District that they did not agree to the IEP because it set low expectations for C.H., failed to adequately address functional Communication needs, and lacked authentic participation in the classroom. They also expressed concerns about the effectiveness of the Verbal Behavior classroom. Progress reports for the 2010-2011 school year again noted improvements in all of C.H.'s academic subjects except math, which was too difficult to gauge.

## II.  Procedural History

Defendant filed a Motion to Dismiss on October 17th, 2011, which I granted with leave to Plaintiffs to amend. Plaintiffs filed their first Amended Complaint on January 22, 2012. Defendant filed a second Motion to Dismiss, which I denied. The parties have since filed cross motions for judgment, which are ripe for review. For the reasons set forth, I will Grant Defendant's Motion for Judgment on the Administrative Record.

## III.  Standard

The IDEA, 20 U.S.C.S. § 1400 et seq., allows review of the administrative record under 20 U.S.C.S. § 1415(i)(2) of the Act and provides that the district court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as it determines is appropriate. 20 U.S.C.S. § 1415(i)(2).

Review of an IDEA appeal in the district court is "modified de novo." S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3rd Cir. 2003). The district court "may reach an independent decision, except that it must accord the decision of the [hearing officer] 'due weight' in its consideration." Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 524 (3rd Cir. 1995), cert. denied, 517 U.S. 1135 (1996). "Due weight" means "[f]actual findings from the administrative proceedings are to be considered prima facie correct." S.H., 336 F.3d at 270. If the court departs from the administrative findings, it must detail why. Id.; Scott P., 62 F.3d at 527.5

The burden of proof is on the party bringing the administrative complaint, here the Plaintiffs, a burden that continues on appeal. Schaffer v. Weast, 546 U.S. 49 (2005); L.E. v. Ramsey Bd. of Educ., 435 F.3d 384 (3rd Cir. 2006). To the extent Plaintiffs' Section 504-based claims in Count II are not adjudicated under the above standard, the familiar Rule 56 standard applies. Fed. R. Civ. P. 56.[11]

_____

[11] Plaintiffs' motion is for Summary Judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material

## IV.  Discussion

### a.  Statute of Limitations[12]

The hearing officer did not err when she determined the statute of limitations was applicable to the claims at issue.  There are only two statutory exceptions to the IDEA's two-year statute of limitations.  20 U.S.C. § 1415(f)(3)(D).  To depart from the rule, Plaintiffs must prove: (1) the District made a misrepresentation and/or withheld information and (2) this conduct prevented the parent from requesting the due process hearing.  Evan H., 2008 U.S. Dist. LEXIS 91442, 2008 WL 4791634, at *6; School Dist. of Philadelphia v. Deborah A., Civ. A. 08-2924, 2009 WL 778321, * 4 (E.D. Pa. March 24, 2009), aff'd, 422 Fed. Appx. 76 (3rd Cir. April 6, 2011).  "[T]o show a 'specific misrepresentation,' Plaintiffs must establish not that the District's evaluations of the student's eligibility under IDEA were objectively incorrect, but instead that the District subjectively determined that the student was eligible for services under IDEA and

---

fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case."  Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, the adverse party's response "must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e)(2).  Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party.  Anderson, 477 U.S. at 255.  The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  Id. at 252.  If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's "version of events against the opponent, even if the quantity of the [moving party's] evidence far outweighs that of its opponent."  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

[12] "A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows."  20 U.S.C. § 1415(f)(3)(C).

intentionally misrepresented this fact to the parents." Evan H., 2008 WL 4791634 at *6. See also D. K. v. Abington Sch. Dist., 696 F.3d 233, 245-46 (3d Cir. 2012).

In Sch. Dist. of Phila. v. Deborah A., 2009 U.S. Dist. LEXIS 24505 (E.D. Pa. Mar. 24, 2009) aff'd, 422 Fed. Appx. 76 (3rd Cir. April 6, 2011), the Plaintiffs argued that the District repeatedly misrepresented that the student was doing well and making significant progress in all areas, including her reading. Id. at 12-13. According to Plaintiffs, despite the mother's protests that the student's needs were not being addressed, the District misled her by withholding information about the student's standardized test scores that would have demonstrated her regression. Id. The court found that Plaintiffs arguments did not evince a specific misrepresentation, nor did the record indicate that the District intentionally misrepresented anything to the Plaintiffs. At most, the court held, the IEPs were inadequate to address the student's needs, but found that was not sufficient to warrant application of the statutory exception. Id. at 13. Believing a school District's assessment of a student to be wrong does not rise to a specific misrepresentation. Id.

In Evan H. v. Unionville-Chadds Ford Sch. Dist., 2008 U.S. Dist. LEXIS 91442, 20-21 (E.D. Pa. Nov. 4, 2008), plaintiffs filed a special education due process complaint against the District. Prior to the due process hearing, the hearing officer determined that the two-year limitations limited consideration of some of the plaintiffs' compensatory education claims. Plaintiffs' in Evan H alleged that the District misrepresented that Evan did not qualify for services under an IEP rather than acknowledging that Evan was eligible. Id. at 18-19.

Plaintiffs contend the School District misrepresented progress reporting and withheld information regarding the VBMAPP. Am. Compl. ¶ 22(t)(i). Such general disagreement is insufficient. Evan H., 2008 WL 4791634 at *6. Plaintiffs' argument is no different than the argument rejected in Evan H. and Deborah A, specifically that progress reports said C.H. "was making 'good progress' when she was not. . . ." Am. Compl. ¶ 22(t)(i).

Plaintiffs also claim that the School District did not provide the VBMAPP to Parents and therefore withheld information. Under the withholding exception, a party must have been prevented from requesting a due process hearing due to "the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." Evan H., 2008 U.S. Dist. LEXIS 91442, 2008 WL 4791634, at *7 (citing 20 U.S.C.A. § 1415(f)(3)(D)(ii)). In Evan H, the court discussed its interpretation of what would be improperly withheld under the subsection stating:

> Another federal district court that has interpreted this provision concluded that [the information required to be provided] refers to "the procedural safeguards and prior written notice required by 20 U.S.C. § 1415(d)." El Paso Indep. Sch. Dist. v. Richard R., 567 F.Supp.2d 918, 945 n. 35 (W.D. Tex. 2008). Section 1415(d), entitled "Procedural safeguards notice," states how and when a notice of these procedural safeguards must be made available to parents and details what information such a notice must contain. It does not refer to any of the substantive information, regarding specific services available to a student and a particular student's educational progress …. Another district court within the Third Circuit has similarly concluded that the withheld information referred to by the second exception represents procedural safeguards available to a parent. D.G. v. Somerset Hills Sch. Dist., 559 F.Supp. 2d 484, 492 (D.N.J. 2008). These safeguards, according to that court, "includ[e] filing a complaint and requesting an impartial due process hearing," as provided for by law. Id.

Evan H. v. Unionville-Chadds Ford Sch. Dist., 2008 U.S. Dist. LEXIS 91442, 20-21 (E.D. Pa. Nov. 4, 2008). The court found that plaintiffs did not alleged, nor did the record provide any evidence indicating, that they were not apprised of the due process complaint process. Id.; D. K. v. Abington Sch. Dist., 696 F.3d 233, 246-47 (3d Cir. 2012) (finding it is insufficient for a plaintiff to simply point to evidence of specific misrepresentations or withholding of information; a plaintiff must also show that the misrepresentations or withholding caused her failure to request a hearing or file a complaint on time).

Similarly, Plaintiffs have not provided any arguments or evidence that any of the District's actions prevented Plaintiffs from requesting the due process hearing. 20 U.S.C.A. § 1415(f)(3)(D). The section plainly indicates that only the failure to supply statutorily mandated disclosures can toll the statute of limitations. Plaintiffs can satisfy this exception only by showing that the school failed to provide them with a written notice, explanation, or form specifically required by the IDEA statutes and regulations. See D. K. v. Abington Sch. Dist., 696 F.3d 233, 246 (3d Cir. 2012). Therefore, giving "due weight" to the Hearing Officer's factual findings regarding the District's purported misrepresentations and withholdings, I find that the Plaintiffs have not pled, nor does the record indicate that either exception applies to toll the statute of limitations in this case.

**b. Plaintiffs' IDEA Claims**

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education" ("FAPE"). 20 U.S.C. §

1400(d)(1)(A).  The IDEA, 20 U.S.C.S. § 1400 et seq., recognizes that education is

traditionally a state function.  Accordingly, it leaves the responsibility of providing a free

appropriate public education to students with disabilities to state and local educational

authorities.  20 U.S.C.S. § 1400(c)(6), (b)(8); 34 C.F.R. §§ 300.13, 300.600.  Provision of

a FAPE requires that special education and related services must meet the standards of

the state educational agency, and must include an appropriate preschool, elementary, or

secondary school education in the state involved.[13]  20 U.S.C.S. § 1401(8), (18).

    In Winkelman v. Parma City School Dist., the Supreme Court defined FAPE

pursuant to an independent educational plan ("IEP") in the following manner:

> An educational instruction specially designed to meet the unique needs of a
> child with a disability, coupled with any additional related services that are
> required to assist a child with a disability to benefit from that instruction.
> The education must, among other things, be provided under public
> supervision and direction, meet the standards of the State educational
> agency, and include an appropriate preschool,  elementary school, or
> secondary school education in the State involved.  The instruction must, in
> addition, be provided at no cost to parents.

    550 U.S. at 524-25 (citing Board of Education v. Rowley, 458 U.S. 176).

To ensure that every qualifying child receives a FAPE, school districts must develop an

IEP that is tailored to the child.  Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v.

Rowley, 458 U.S. 176, 181 (1982).  "'An IEP consists of a specific statement of a

student's present abilities, goals for improvement of the student's abilities, services

---

[13] The Individualized Education Plan is the "centerpiece" of the IDEA, 20 U.S.C.S. § 1400 et seq.  The IEP consists of a detailed summary of the child's abilities, outlining the goals for the child's education and specifying the services the child will receive.  It must include, among other things, a statement of the child's current level of educational performance, annual goals for the child, specific educational services to be provided, and the extent to which the child will participate in regular educational programs.  34 C.F.R. 300.346.

designed to meet those goals, and a timetable for reaching the goals by way of the services.'" D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (quoting Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000)).  Compliance with the IDEA requires that a student's IEP be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07.  An IEP will be deemed to provide an appropriate education if it provides for "significant learning" and confers a "meaningful benefit." Ridgewood Board of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 247 (3d Cir. 1999).  When determining whether a proposed IEP is reasonably calculated to enable a child to receive educational benefits, a court must determine the appropriateness of an IEP as of the time it was made. Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995).

Although a school district is required to provide a FAPE to all disabled children, 20 U.S.C. § 1412, it is not required to provide the best possible education to maximize educational benefits. Rowley, 458 U.S. at 197 n.21; Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 178 (3d Cir. 1988).  Moreover, parents do not have a right to compel a school district to provide a specific program or employ a specific methodology in educating a student. See Rowley, 458 U.S. at 199 (stating that a FAPE does not require "the furnishing of every special service necessary to maximize each handicapped child's potential").  Nor is a school district required to provide each disabled child an equal educational opportunity commensurate with the opportunities provided to other children. Id. at 198.  Because I find that the Statute of Limitations bars some of Plaintiffs claims, I will focus on the portion of the 2008-2009 school year forward.

Plaintiffs first argue the C.H. was deprived of a FAPE during the 2008-2009 school year. The Hearing Officer found, and I agree, that there is little evidence regarding the relevant portion of the 2008-2009 school year and there is no evidence, save Plaintiffs' and their expert's contentions, that the educational program was not appropriate for C.H. For the 2009-2010 school year, the District changed from the ABLLS to the VB-MAPP instruction and assessment and Plaintiffs were issued progress reports on C.H.'s IEP goals at least once every five weeks.[14]

Plaintiffs claim that C.H. was denied a FAPE because of the District's delay in addressing C.H.'s hearing and speaking disabilities. Additionally, Plaintiffs argues C.H. was not provided with the appropriate software for the ChatPC device and was not provided with other timely auxiliary aids. Due to these failures, C.H. did not make meaningful progress. Plaintiffs rely heavily on their expert testimony.

Plaintiffs argue that the delay in using the ChatPC and the delay in implementing the recommendation from the audiological evaluation failed to provide C.H. with a FAPE. They contend that the hearing officer inappropriately applied the reasonable time standard and incorrectly found that C.H. made meaningful progress under the IDEA. However, Plaintiffs concede that the ChatPC had limited functionality and upon the integration of the device in C.H.'s school environment, "her inappropriate behaviors dropped significantly and continued to decrease as District personnel attempted to make the device more functional for C.H."

---

[14] Plaintiffs rely heavily on their expert for this period, but it is important to note that the Hearing Officer found that the expert's "statement was made without elaboration and, in fact, was given less definitively when the witness tried unsuccessfully to locate the IEP document in question and could not confirm whether she had it in her possession."

Neither the IDEA, its implementing regulations, nor the applicable Pennsylvania regulations, establish a deadline by which children who are suspected of having a qualifying disability must be identified and evaluated. Accordingly, this Circuit has previously inferred "a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." Matula, 67 F.3d at 501. In applying the "reasonable time" standard, courts must consider the budgetary constraints and staffing pressures facing school officials, and employ a case-by-case approach and assess whether the school district's response was reasonable "in light of the information and resources possessed" by the district at a given point in time. Id. See M.R., 680 F.3d at 273 ("the school district must be afforded a reasonable time to monitor the student's progress before exploring whether further evaluation is required. . . . The IDEA does not require a reevaluation every time a student posts a poor grade.").

In K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 830 (E.D. Pa. 2011), Plaintiffs argued that K.C. was denied eighty-four hours of sensory occupational therapy and one hundred seventeen hours of executive functioning services. The court concluded that the ultimate question was whether these delays resulted in the denial of a FAPE. "Delays are procedural violations of the IDEA and '[a] procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents.'" K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 830 (E.D. Pa. 2011) (citing C.H. v. Cape Henlopen School Dist., 606 F.3d 59, 66 (3d Cir. 2010). The IDEA's

implementing regulations indicate that "substantive harm occurs only if the preponderance of the evidence indicates that 'the procedural inadequacies (i)[i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit.'" Id. at 67 (quoting 34 C.F.R. § 300.513(a)(2)); see also Bayonne Bd. of Educ., 602 F.3d at 565 ("[T]hough it is important that a school district comply with the IDEA's procedural requirements, rather than being a goal in itself, such compliance primarily is significant because of the requirements' impact on students' and parents' substantive rights."); Souderton Area Sch. Dist. v. J.H., No. 08-2477, 2009 U.S. Dist. LEXIS 10781, 2009 WL 349733, at *6 (E.D. Pa. Feb. 11, 2009) ("Procedural errors do not violate the right to a FAPE unless they result in 'the loss of educational opportunity, seriously infringe upon the parents' opportunity to participate in the IEP formulation process, or cause a deprivation of educational benefits.") (citations omitted).

     Plaintiffs offer nothing in support of their argument that the District failed to evaluate C.H. They claim that the District knew in January 2009 that C.H. suffered from mild hearing loss in one ear, but did not evaluate the student for an amplification device until October 2010. However, in fact, the District's audiologist recommended audiometric evaluations annually or sooner, if C.H.'s response to auditory stimuli changed. In the Spring of 2010, it was discovered that C.H. had mild hearing loss in both ears. Although the District performed the audiological evaluation slightly over a year after the 2009 recommendation that the evaluations be conducted annually, C.H.'s

audiologist already had instructors talk to C.H. in her right ear and had C.H. turn to the right to listen to teacher's instruction. C.H.'s aide would also sit on the student's right side during class to work with C.H. Further, after the Spring 2010 evaluation, the District did another evaluation the following Fall 2010, in which it specifically tested C.H. for a sound amplification device. Therefore, not only did the District follow its own recommendation for evaluating C.H., Plaintiffs make no argument that the time frame was unreasonable other than simply declaring it so.[15] Finally, the District's audiologist, Paula Fellin, testified that she felt the FM device was unnecessary for C.H. given the student's typical learning environments have a "favorable" signal to noise ratio and stated that the addition of an FM device would provide no additional benefit.[16]

C.H. made improvements with the introduction of the ChatPC. The Hearing Officer also found that C.H. was provided with a FAPE because no matter the functionality of the ChatPC, the student, even today, fails to use the device consistently

---

[15] The Plaintiffs argue that the District lowered the word requirement on C.H.'s IEPs, which demonstrates that C.H. was not making meaningful progress because her cognitive abilities remained the same. Plaintiffs attribute the lower word requirement and C.H.'s failure to improve on the failure to timely evaluate and implement an FM system. Plaintiffs also argue that there was a significant jump in the number of sight words C.H. was able to implement after the institution of the FM system.

The District continued to evaluate and create IEP's for C.H. and despite the lower word requirement, the IEP remained appropriate for that school year. The Plaintiffs, again, rely only on their expert to support these conclusions. As I find that the District evaluated C.H.'s hearing loss and need for an FM system in an appropriate time, I conclude that the District's IEP, despite the lower word count, was appropriate for the student. Although there was a jump in the sight words after the implementation of the FM device, there are other factors that could have contributed to C.H.'s success. Ms. Fellin testified that C.H. could simply have been maturing or catching on to the environment. She commented that although the FM device was a factor, she felt that C.H. was hearing was "as good as it has been" and "she has been able to hear [her teacher] and learning words."

[16] In April 2010, after the mild hearing loss in both of C.H.'s ears was discovered, the audiologist noted that C.H. had an "optimum listening environment for the majority of the day due to the full-time aide, a small classroom size, one-on-one instruction, and favorable signal to noise ratio in the learning support classroom." (S41 10F20 at 2). Further, Plaintiffs requested the District pay for an independent evaluation of C.H., noting some issues with the school's evaluations. (S45 10F1). Thereafter, the District agreed to pay for the independent evaluation along with a list of evaluators for Plaintiffs to review. (S47 10F6).

across environments. Plaintiffs' contention appears to be that the device is used inconsistently with regard to the math and science programs because the ChatPC has yet to be programmed for those classes.[17] However, the record indicates, and the Defendants argue, the device cannot be programmed effectively for math because the individual "touch points" are too small to be seen and there is simply no preexisting available TouchMath program that can be downloaded on to the ChatPC.

Josephine Brummer, an educational consultant with the District, testified that she meets with C.H.'s father and teacher for a monthly consultation where the three work on programming the ChatPC and have been trying to figure out how to back the device up in case of a catastrophic failure. However, Ms. Brummer stated that C.H. has had access to the device the entire time and the programming was done on the computer to ensure that C.H. could keep using the ChatPC. Although Ms. Brummer testified that she could "see opportunities in the classroom for increased use of" the ChatPC, because C.H. is verbal, her verbal skills will be easier for her to access than her ChatPC. Therefore, since C.H. can be understood, especially by those who have "been with her for quite a while and understand her quite well[,].... The need for the ChatPC is not as great." Although the ChatPC may not have been working properly, the issue was a technical one, which occurred only after the District attempted to put a program from the computer onto the device. It appears that this in no way effected C.H.'s use of the ChatPC in her everyday communication activities.

---

[17] Ms. Brummer testified that science vocabulary changes too quickly to be programmed effectively on the ChatPC. She offered the solution of putting science vocabulary on a sheet of paper with pictures, so that C.H. simply points to the words on the paper.

Plaintiffs also argue that the Hearing Officer ignored Dr. Hain's testimony concerning the district's failure to properly diagnose C.H., failure to provide her opportunities to socialize, and failure to make progress because the district provided only ESY services and incorrect language programs. In addition, Plaintiffs claim that C.H. was denied a FAPE because the District did not reevaluate and develop an appropriate IEP for C.H. The IDEA requires that IEPs be reviewed "periodically, but not less than annually to determine whether the annual goals for the child are being achieved; and revise[d] . . . as appropriate." 20 U.S.C. § 1414(d)(4)(A)(i)-(ii). "The federal courts have said little on the failure to revise programs, but the school district is required to revise the programs as appropriate." Kings Local Sch. Dist., Bd. of Educ. v. Zelazny, 325 F.3d 724, 731 (6th Cir. 2003); Caitlin W. v. Rose Tree Media Sch. Dist., 2009 U.S. Dist. LEXIS 42307 (E.D. Pa. May 15, 2009). "[P]rocedural violations that deprive an eligible student of an individualized education program or result in the loss of educational opportunity . . . will constitute a denial of a FAPE under the IDEA." Knable, 238 F.3d. at 766.

The Hearing Officer concluded that the programs used for C.H. were appropriate and pointed out that with the "Edmark reading program, there was also no evidence to demonstrate that Student's progress was less than meaningful, or what the expectation of Student's progress was that was not met." She concluded that, when the evidence is viewed as a whole, C.H's program during the 2009-10 school year, including the summer of 2010, was reasonably calculated to, and did, provide meaningful educational benefit to Student." Plaintiffs, she further explained, did not meet their burden where their only evidence to the contrary was their expert who "failed to provide any explanation of how

the program was deficient."[18] Id. The Hearing Officer's assessment of the following

year, 2010-11 noted that the program included most of the recommendations offered by

the various private reports, that programs used were appropriate, and that "Student's

progress on the various IEP goals over the course of the school year, particularly when

viewed in the context of Student's needs, also suggests that Student's IEPs were

appropriate and reasonably calculated to provide meaningful educational benefit."

I agree with the Hearing Officer. There is no evidence that C.H. was deprived of

an FAPE and no evidence that the student suffered the loss of any educational

opportunity. In Ridgewood Board of Ed. v. N.E., 172 F.3d 238 (3d Cir. 1999), the Third

Circuit elaborated that an IEP, in order to meet this standard, must provide "significant

learning" and confer "meaningful benefit." Id. at 247. While an IEP need not maximize

the potential of a disabled child, the benefit must be more than "trivial." Id. at 247 (citing

Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3d Cir. 1988)). A

meaningful benefit, "must be gauged in relation to the child's potential." Polk, 853 F.2d

at 185.

The educational program developed for C.H. gave her personal and one-on-one

attention through the use of aides and educational teams. An occupational therapist

contracted by the District, Christine Hess, testified that C.H. had "shown progress in OT"

during the 2010-2011 school year.[19] Further, although the Plaintiff's psychologist

---

[18] Contrarily, Lisa Jacobsen, the schools Psychologist, testified that in her review of the Plaintiffs' expert report, she "wondered about how accurate certain assessments could be in terms of measuring skills, because the tasks on the assessment … would be very difficult for [C.H.]."
[19] Ms. Hess testified that she was in constant contact with C.H.'s team members who are "all working together" on C.H.'s IEP goals.

recommended that C.H. receive full time speech therapy, the speech therapist, Janet

Scull, testified that she did not agree with that opinion or the use of FastForWord for

C.H.'s needs.[20]  She testified that C.H. has "consistently shown significant progress with

her speech goals… she advanced her vocabulary from just one word to two or three

sometimes four-word phrases…that she has put together on her own."[21]  She testified that

her basis of knowledge stems from working with C.H. since kindergarten seeing her

every other school day.[22]

      The District's actions in evaluating C.H. and implementing programs for her did

not deprive C.H. of a FAPE.  The District did not significantly impede the parent's

opportunity to participate in the decision-making process regarding the provision of a

FAPE to the parent's child.  In fact, many of the parents' requests were incorporated into

C.H.'s IEP's and educational instruction.[23]  Parents received all or most of the

---

[20] Specifically, Ms. Scull stated that she read the reports from Plaintiffs' expert, Lisa Hain, as well as Maxine Young and disagreed based on her 25 years of experience with Dr. Hain's recommendation for a full-time speech therapist for C.H.  She testified that the only way to evaluate the students' progress is to have "them be in other settings without the speech therapist there." She concluded that C.H. was making progress with her three times a week regimen and did not need a full-time speech therapist.

She also stated that she did not recommend the Fast Forward program because it was implemented before and the students did not show "significant gains in order to continue the program." Further, the speech therapist testified that there was just no time to pull C.H. out of classes for a 90 minute session of Fast Forward with all her other therapies.

[21] The learning support teacher, Corriann Myers, corroborated this testimony and elaborated that she noticed C.H.'s progress for the 2009-2010 school year stating C.H. "is not only saying one word. She is maybe saying two – you know, two to three words. Sometimes she will say … four or five words at a time. …[S]he is improving when you compare it to what she was doing in the beginning of the school year, let alone when I first met her in the summer of 2009."

[22] The speech therapist sends log sheets home to the parents every week noting whether C.H. is correctly pronouncing and repeating the goal phrases and words for that week.

[23] For example, in an email in Spring 2010, the school psychologist replied to an email sent by Plaintiffs regarding their concerns that some additional assessments should be included in C.H.'s reevaluation. The email specifically states that all but one of those assessments was, in fact, covered by the permission that parents signed.  Further, the psychologist replied that she would "be happy" to do the sensory assessment not already covered by the PTR. (S 39 – 10F2).

information about C.H.'s progress that was contained in the ABLLS or VBMAPP through the IEP progress reports, which were provided quarterly in accordance with the IDEA. These quarterly reports also included progress monitoring charts. Moreover, the IEP's in place did not cause a deprivation of the educational benefit. Me. Sch. Admin. Dist. No. 56 v. Ms. W., No. 06-81-B-W, 2007 U.S. Dist. LEXIS 22085, 2007 WL 922252, at *8 (D. Me. Mar. 27, 2007) (holding that delay in providing services "was appropriately faulted," but the delay "simply did not independently lead to a denial of educational benefit or a [FAPE]").

I find that the Hearing Officer engaged in a thorough consideration of the evidence in her determination and that the record "read in its entirety [does not] compel a contrary conclusion." S.H., 336 F.3d at 270. With regard to Plaintiffs' expert, I find that the Hearing Officer found that Plaintiffs' expert "was qualified to render such an opinion" and considered the opinion and its foundation. The Hearing Officer did not discredit the expert. For example, the Hearing Officer found that the Plaintiffs' expert was not even aware of the programs offered during the 2011 extended school year, and therefore incapable of saying the program was not appropriate for C.H. Where a hearing officer "has heard live testimony and determined that one witness is more credible than another witness, [the hearing officer's] determination is due special weight." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (citation omitted). A district court must accept the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion." Id. (citations omitted). Further, Plaintiffs cite no non-testimonial evidence in arguing that the hearing

officer erred with respect to their expert's conclusions. They merely cite back to the

expert's opinion.  Plaintiffs have simply not met their burden under the IDEA. Further, I

find C.H. was provided significant learning and conferred a meaningful benefit.

### c.  Violation of Section 504 of the Rehabilitation Act of 1973

Section 504 provides, in relevant part, that: "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal Financial Assistance . .

."[24] 29 U.S.C. § 794(a).  The elements of a statutory §504 discrimination claim are: (1) a

qualifying disability; (2) qualification to participate in school activities; (3) receipt of

federal financial assistance; (4) exclusion from participation in, or denial of the benefits

of, or otherwise discriminated against in the school program.[25]  Ridgewood Bd. of Educ.

v. N.E. ex rel. M.E., 172 F.3d 238 (3d Cir. 1999) (citing W.B. v. Matula, 67 F.3d 484,

492 (3d Cir. 1995), abrogated on other grounds by A.W. v. Jersey City Public Schools,

486 F.3d 791 (3d Cir. 2007)).

Plaintiffs argue that proving intentional discrimination is not required under §504,

and because the RA and the IDEA overlap considerably, violations of Part B of the IDEA

---

[24] The IDEA and §504 of the Rehabilitation Act provide nearly equivalent requirements.  The IDEA provides an affirmative duty to provide education, whereas the Rehabilitation Act prohibits discrimination against the disabled. Grieco v. New Jersey Dept. of Edu., 2007 U.S. Dist. LEXIS 46463, at *11 (D.N.J., June 27, 2007) (citing W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995) (abrogated on other grounds by A.W. v. The Jersey City Pub. Sch., 486 F.3d 791 (3d Cir. 2007)).  "There appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition."  Suscavage v. Bucks County Sch. Intermediate Unit, et al., 2002 U.S. Dist. LEXIS 1274, at *50 (E.D. Pa. Jan. 22, 2002) (quoting Matula, 67 F.3d at 492-93).

[25] Similarly, the ADA also prohibits discrimination against the disabled.  Like §504 claims, which can be based on the discriminatory effect on disabled children of seemingly neutral practices, ADA claims do not require a finding of intentional discrimination.  See Suscavage, 2002 U.S. Dist. LEXIS 1274, at *53.

are almost always violations of the RA.  Therefore, if a student between the ages of three and twenty-three is denied a FAPE, then they "have been denied this guarantee to education based solely on their disability," which will result in both a violation of the IDEA and §504.[26]   The Defendant argues that Plaintiffs have not stated a claim for relief stemming from the §504 violation because simply disagreeing with the hearing officer is insufficient based on the statutory language of the IDEA, which provides a cause of action to "any party aggrieved by the findings and decision" of the hearing officer.[27]  20 U.S.C. § 1415(i)(2)(A).  They argue that an IDEA violation does not automatically raise a claim under the RA because "[a]lleging a mere FAPE violation alone is not enough for a claim a discrimination."  (Doc. 15 at 3 citing Andrew M. v. Del. County Office of Mental Health & Mental Retardation, 490 F.3d 337, 349 (3d Cir. Pa. 2007)).

Plaintiffs have failed to demonstrate any error in the hearing officer's conclusions of fact or law to show that they have a claim under section 504. Plaintiffs have presented no evidence that C.H. "was excluded from participation in, denied the benefits of, or subject to discrimination" in the District. Christen G. by Louise G. v. Lower Merion Sch. Dist., 919 F. Supp. 793, 821 (E.D. Pa. 1996); Ridgewood Bd. of Educ., 172 F.3d at 253.

---

[26] In order to state a claim for relief in a section 504 statutory discrimination claim plaintiffs must allege errors of law or fact made by the hearing officer.  See J.L. v. Ambridge Area Sch. Dist., 622 F. Supp. 2d 275 (W.D. Pa. 2008) (plaintiffs allege that it was error for the administrative appeals panel to refuse to apply the continuing violation doctrine to overcome the statute of limitations); J.S. v. Lakeland Sch. Dist., 2011 U.S. Dist. LEXIS 14058 (M.D. Pa. Feb. 14, 2011); Council Rock Sch. Dist. v. Bolick, 2010 U.S. Dist. LEXIS 135346, 17-18 (E.D. Pa. Dec. 22, 2010); L.S. v. Abington Sch. Dist., 2007 U.S. Dist. LEXIS 73047 (E.D. Pa. Sept. 28, 2007); D. K. v. Abington Sch. Dist., 2010 U.S. Dist. LEXIS 29216, 2-3 (E.D. Pa. Mar. 25, 2010).

[27] Defendant also argues that the claim under Section 504 was added simply to seek expert witness fees. (Doc. 15 at 3).

Furthermore, as the IDEA and § 504 are very similar and result in similar available relief, and since I have determined that there was no violation of the IDEA in this matter, no further remedy under § 504 is necessary or appropriate. Therefore, I find in favor of Defendant.

### d. Damages and Attorneys' Fees

First, because Parents' Rehabilitation Act claim fails, they are not entitled to damages. Plaintiffs request attorneys' fees under the IDEA. Pursuant to the IDEA, the court, "in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). To qualify as a prevailing party, a plaintiff must "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." <u>John T. ex rel. Paul T. v. Del. County Intermediate Unit</u>, 318 F.3d 545, 555 (3d Cir. 2003) (quotation omitted). The "touchstone" of the inquiry is "the material alteration of the legal relationship of the parties." <u>Id.</u> (quotation omitted). Because Plaintiffs have not succeeded on the merits, Plaintiffs are not a "prevailing party" and are not entitled to attorneys' fees.

### V. Conclusion

For the reason stated above, I will grant the Defendant's Motion for Judgment on the Administrative Record and Deny Plaintiffs' Motion for Summary Judgment. The decision of Hearing Officer will be affirmed.

An appropriate Order follows.